May it please the court, Charles Tulin appearing here today for the appellant. This case arises and involves the death of a 22 year old Dane Johnson who committed suicide after being taken into custody by Unalakleet police officer George Turner. The defendant, Officer Turner, claims qualified immunity. The court and the cases hold that qualified immunity might apply to this case unless we have an officer who was plainly incompetent and by the facts I'm going to outline I'm going to demonstrate that Officer Turner by his actions was plainly incompetent and secondly that he failed to follow the training and instructions that he had gotten from the Academy. In order to understand the case one has to step back and realize that Dane had gone hunting early in the day with his cousin, Fumit, a short time before this event. He had in his pocket two guns, a .357 Magnum and a... Mr. Tulin, forgive me, I think we understand the facts pretty well. Your brief lays those out. I appreciate your focusing on this. The, do you concede that you really can't establish a purpose to harm in this the plain incompetence of the police officer? Okay, and is it your view that his conduct shocks the conscience? That is correct. Okay, as I understand it this is a young man, he was drunk, he ran over this young girl, he was very remorseful. Officer Turner was having to control traffic, he was trying to look after the young girl, he was trying to get hold of other people to help him and so on. That seemed pretty normal to me. I don't, I don't get what's so shocking about that. Well that was not the case. First of all, he was terribly intoxicated, staggering, mumbly, incoherent, we understand that. The officer was? No, Dane Johnson was terribly intoxicated. The district judge said there's no question about his intoxication at .171. Okay. Okay, and also he smelled alcohol, those present knew he was drunk and the idea that he was trying to control traffic just is not the facts because Victoria Katongin testified that when they were putting coats on the little girl, ten-year-old, that there approximately eight people assembled. Two years later, Turner, Officer Turner concludes there were 20 to 50 people gathering and he was controlling traffic. He also indicates that it took about eight minutes. The big guns, 12 inches long, weighed two and a half pounds, fully loaded. And Dane was incoherent and 17 minutes prior to this intercept, he had been called out to a threatened suicide. He collected from the threat. Who did that? Officer Turner had been called to a threatened suicide before this subject. Oh, I see, okay. And at the threatened suicide, there's 17 minutes prior to the police call, he picked up seven guns, put them behind the seat in the back of the patrol car where he seated Dane Johnson. And that's covered in both the excerpts of record from the appellant and appellee. Now, he arrives on location. He said, look, these little girls tell him what happened. He had been speeding down the road on the wrong side of the road, zigzagging and swaying in the seat. He ran over the little girl and she is laying unconscious. He grasps his head. He is in agony. He appeared to be in agony. He said, I'm so sorry. I didn't mean to do it, didn't mean to do it. So when these facts are known to the officer, we have a felony assault, manslaughter. He was asked, did you think she was alive? And he said, I heard her groan, so I knew she was alive. Now, is it true that officer Dane goes back to the officer, the officer goes back twice to the car to say, it looks like the little girl is going to be all right? Correct. So he's trying to reassure the decedent that, listen, your worst fears are not going to be realized. So he's conscious of the distress. And the mistake he made is that he didn't take the guns away. Now, is there any dispute as to which gun was used to kill himself? He used one of his own. .357 Nagant. He used one of his own. Right. So it's a red herring that he might have put other guns in the back? No, it just shows his incompetence. There's no showing in the record. You know, the standard is not incompetence. It's either intent to harm or deliberate indifference. So you've got to fit it in under deliberate indifference. That's a little different from being incompetent. Yes. And I think in the Reno case or whatever, this court talks about this indifference. But in any event, so Officer Turner says, in effect, he handcuffs him in front. And in violation of the training, he had a training manual, which gave him access to the guns in his pockets. Like I say, they weighed two and a half pounds, fully loaded. He pulled out the .357 and shot himself through the head. Now, is there any dispute that the practice of the police department was that unless the person you're arresting is known somehow to be a danger, that you don't risk him for weapons until you get him back to the station? Was he following practice of the local police department? There was. He did it his own way. In the training manual, which we have, it says, in effect, when you take one into custody in 19, in 2007, the manual says, you pat them down. Anybody you take into custody, you pat down. And is that the manual for the local police department? There is no manual for the local police department. And let me ask you this. What's the custom in the local police department? Do we have evidence on that point? There's no policy and no custom. It's just do it your own way. I thought there was evidence that the custom in that police department was that unless there's some reason to be worried about the danger posed by the person you're arresting, you don't do a search until you get him back to the station. That was that Officer Turner indicated that his practice was not to search them until he got them back to the station. But he didn't testify. There was no one who testified that it was the general practice of that police department? That is correct. It's also significant that the City of Unalake is a member of the Police Standards Council that sets police practices, procedures, and discipline about the state of Alaska. So I gather that you agree with the district court's ruling that the city itself is entitled to qualified immunity under 1L. Is that correct? Well, the city is, certainly they adopted a policy of indifference, having sat on the Police Standards Council. First of all, Unalake is a member of the Police Standards Council. In 2008, Governor Sarah Palin appointed the mayor to not only be a member, to sit on the council. And from the months and years that followed, the city did nothing to adopt any policy for its five-member police force, including one intern, which would significantly indicate that given the circumstances of intoxication at 1.171, when asked whether he noticed any intoxication, Officer Turner indicated, I never saw any sign of intoxication. So at that point, it's pretty clear everyone else noticed the extremes of intoxication, excepting him. He admits that he handcuffed Dane in front. He was asked about the welfare of the little girl. He said he hurt her groaning, okay? His incompetence is also demonstrated by the manual with which he was trained, which says an officer having custody of a prisoner is responsible for protecting the prisoner in his care, and he's responsible for searching the person, clothing, items carried by the person for weapons. Do you believe that Officer Turner did attend the training courses that met the requirements for training that applied to this little city? Is that correct? That is correct. Okay, and as far as suicide prevention is concerned, my understanding is there's no evidence that the city disregarded any known or obvious consequences that an omission like this would cause city employees to violate a citizen's constitutional rights. Is that a fair statement? That is a fair statement. Okay, and what were the indications or the indicia in this case that Officer Turner should have noticed that Mr. Johnson might attempt suicide? His extreme distress, incoherence, staggering. I get all of that. The guy was terribly drunk. He was terribly distraught, but I'm asking for a particular focus on the concept of suicide. Did he say anything? Did he do anything that should have alerted a reasonable officer that this man was at risk to take his own life? Both he and city administrator Herb Ivanoff indicated suicide was a problem in the village of Yellow Cleet, seven times the national average throughout the state. Sadly, that is a problem in a lot of Native American situations, and it grieves me terribly about that, but in this particular case, is there any indicia that this officer heard anything from this particular person who was intoxicated, that he was going to take his own life, that he was so distressed that he just couldn't stand to live any longer, anything like that? Only thing I know about is that he told the girls identified or testified that he was in such extreme distress as he appeared to be in agony, and when Freitag, a lady named Marie Freitag arrived, she indicated his whole body was shaking, so he was certainly in bad condition, and that's all I have. But nothing specific that would say, that would tip off this officer Turner that there was a likely suicide victim? That is correct. Okay. But there is, another thing about this officer Turner and the custody, they asked, do you agree that you took Dane into custody? He said, by custody, what do you mean? He didn't know what custody meant, whatever the police mean by the word custody. He said, I put him in the, in the truck, but I don't think I had him in custody yet, but he was being held. I don't know if being held is like custody. When asked about arresting him, he said, why did you arrest him? Or why did you, pardon me, why did you put the handcuffs on? Answer, I don't know why I handcuffed him, I did it by accident. So any police officer who handcuffs somebody by accident, and who covers these items, and there was no police manual of any kind to give him any guidance. So it was the intoxication, there was a felony crime, perhaps manslaughter, his putting the guns behind the seat, he, the not knowing what custody is, or handcuffing, not searching, this sort of thing demonstrated his incompetence. Turning briefly to the city of Unalakleet, they, they were members of the council, they, the mayor sat on the council, they had five-man police force, they had no supervised supervision of their five-man police force. Herb Ivanoff, the city manager, was asked a series of... Is it not a council in a lot of these smaller towns, they don't have the resources to do more, perhaps some of the local folks who are deputized, who become involved, that's fairly common, isn't it? Well, these were funded in part by the state. I understand. But what I'm saying is that the fact that you don't have NYPD out in an Indian village doesn't mean that they're incompetent, does it? Well, this is not an Indian village, there's 810 people there. Oh my gosh. There's the, the village, the village is within the confines of the city. In addition to all of this, 11 months ago, on July the 22nd, 2011, the Alaska Supreme Court ruled that there can be an independent state law claim against the for failure to properly train and supervise, even if the officer is entitled to qualified immunity. That's 258 P. 3rd at 798. That case recently decided. But in any event, when asked a series of questions, this is the city administrator, does Turner... He was asked questions about training. He said, we have none of that. He was asked, does Turner or any village police officer have any written policy? No. So the city doesn't give them any documentation about how to do that. No, none. The city admitted in discovery through council that there was no police procedural manual that was in effect at the time George Turner had contact with Dane Johnson, that's the subject to this lawsuit. So, he was asked, does the city at any time ever give handouts or updates on the law to assure currency in police work? No. Do you know of any on-the-job training? No, none. Is suicide a problem? Yes, it is. Do you have any program at all to train officers on discerning seeing and preventing suicide? No, none. So, this court has talked about the idea of a disregard by the city of responsibilities. The Ninth Circuit consistently has found that a municipality's lack of affirmative policies or procedures to guide employees can amount to a deliberate indifference, even when the municipality has other general policies in place, long versus County of Los Angeles with 442, F-3rd at 1178. Does that apply to all municipalities, regardless of their size? I think that small towns in rural Alaska, the citizens of small towns are entitled to the same constitutional protection as those who live in San Francisco. So, if the choice is between having regular police training and providing a local municipal water district that you wish to go for the police training, is that correct? Law enforcement throughout the small towns in Alaska is fundamental. Water is important, too, but law enforcement can be problems in these areas, and I think the constitutional protection under DeShaney and some of those cases is that constitutional protection of a one taken into custody applies from the time he's taken into custody. When Turner says, I put the handcuffs on him and locked him in the patrol car, he's entitled to We've taken you slightly over. Let's hear from the other side, and we'll give you a minute to respond. Thank you very much. I'm pleased to report Frank Cozio for Village Police Officer Turner and the City of Unalakleet. You had asked a question as to whether there was any of not handcuffing and searching until arrival at the jail unless the arrestee was dangerous or violent. If you go to page 16 of our brief, the police brief, there's a citation to those facts. And it wasn't just... Those facts or that evidence? That evidence. And it wasn't just a city practice, it was a law enforcement community practice. The state trooper who was stationed there basically also followed that practice. Now, is that a good practice? It is a good practice. And while it sounds like it didn't work out very well here... Yes, but it never... It never had not worked out before that in terms of... But it sounds as though we've got some kind of a manual that says that's not the proper practice. That the proper practice is if you're going to arrest someone at the time of arrest, or you're going to restrain someone, whether you call it formally an arrest, you pat them down. The manual has an exception for business necessity, and the community, including the state trooper, has decided that unless they're violent, we're not going to do that. And there are reasons for that, for them adopting that practice. Number one, this is a small community. Everybody knows everybody, pretty much. And the VPOs know who they're dealing with, unlike LAPD, who, when they encounter a suspect, have no idea what they're about to do. And do we have evidence as to whether or not Officer Turner knew Mr. Johnson? I believe that that is in the record. Yeah, he knew of Mr. Johnson, yes. I didn't ask knew of, I said knew. Knew him. I believe he did know him. I can't cite you a particular... I mean, I know that from doing the depositions, that he knew him. The family, it's a very well known family in the community, the Johnson family. It's one of the primary communities, families in the community. The other reason for this practice is that those police officers cannot carry weapons. And it's very, very important with all police departments, particularly when you can't carry a weapon, to try to foster respect for what you do, and have the community support what you're doing. And because you don't carry a gun, and people you encounter might have guns. So it's a good idea to... I would have thought that that would be all the more reason you'd pat somebody down. You're not yourself carrying a weapon. You might wanna be sure that the other guy isn't. It's a balancing. And if there's no reason to... I don't see the balance. No, if there's no reason to think that the individual is going to be violent, is going to harm himself or others, then you respect them, you respect that judgment, and you don't pat them down, you don't handcuff them to the rear. You follow the general practice. That practice has never led to a problem before this case. I'd be interested in knowing... We have a small town here. People know each other for the most part. What role, if any, should local custom play in a culture where you have that knowing each other, dealing with each other on a regular basis, perhaps resolving disputes in a particular way, play on our Monell analysis? That's really more of a big city concept to some degree. How does that factor in here? I think it's a very important relevant factor for, as you evaluate whether the practice itself was a deliberate indifference practice or a practice that the district court and these officers were working in. I think the facts are undisputed, as basically the district court concluded, this was an unanticipated suicide. There weren't any particular facts that would suggest he was going to kill himself, and the try to profile it and say there should have been a statistical analysis because he fit in with a certain category group, I would suggest is not what you'd want police officers to be doing, and it may well be unconstitutional practice to profile... You mean to do it on the spot, you mean? To conclude, well, I've got a young Alaskan native male who I'm contacting, and because some statisticians say that that category is more likely to commit suicide, that I'm going to conduct a more intrusive search than I ordinarily would do. I think that's a problem. Is there anything in the record that indicates that anything like this has occurred elsewhere in Alaska that they might have been aware of? Other young Native American males and hitting somebody when they're drunk and they get in the back seat of the police car and they shoot themselves. Is there anything like that that you're aware of? No. No, there's no evidence of that. I'm tussling with your statement a moment ago that there might be some sort of racial profiling or constitutional question if statistical analysis were to be used, if the statistical analysis were to show that Native males in a situation like this, drunk, having done something bad, might commit suicide. If they're padding, if the police would be padding down in that circumstance in order to protect the male, I'm not sure I see a difficulty. Meaning, if it's done in a way that would... I'm padding you down because I'm trying to find a gun because I'm trying to convict you. That's one thing. I understand that that's a real problem. But I'm padding you down because I think that there's a higher risk of suicide. I mean, this is done for the benefit of the person you're trying to arrest. We do racial profiling all the time for the benefit of the people. For example, any doctor knows that a black person is at a higher risk of sickle cell anemia and would be negligent in his or her duty if he didn't screen for that. Do we want to respond to that? I think the statistics that were cited by my opponent was not that a young Alaskan Native male was drunk and had done a bad act and is more likely to commit suicide. It was simply his status of being a young Alaskan Native male who's more likely to commit suicide. And to have that justify more intrusive searches simply because of those characteristics, regardless of whether the individual shows anything to fit in that class, I think is discriminatory. And you're conducting more intrusive searches on this wide range of classes of individuals without reasonable justification, only based on statistics, assuming those statistics were correct and you don't have other statisticians disagreeing, as often happens. Yeah, it's a tricky question. I got it. Okay, thank you. Can I have just one minute, Your Honor? No, he's not finished yet. Suzie's finished. I understand. You thought I was telling him he was finished, but I'm not sure he's told me he's finished. It sounds like you're appreciative of the difficulty this Village Police Officer had in determining what to do during those 12 minutes between the time he arrived at the scene and the time the gunfire was shot. He didn't do an investigation. He listened to a couple of witnesses. He listened to any questions. Dane holds out his hands, and he handcuffs him to the vehicle. He was focused on, virtually that entire time, helping the little girl who was seriously injured and may have had life-threatening injuries as far as Officer Turner knew. From a factual perspective, in terms of the record, did Johnson's ability to kill himself increase because he was being held in custody, or is this something that could have occurred even if he were just wandering about the streets and remorseful? Yes, I don't think that this was an enhanced risk case. He could have killed himself. Whether he had just been standing there without being handcuffed in the vehicle, I think the handcuffing made it a little more difficult for him to kill himself. But no, we did not increase the risk of his suicide by those actions. And was the fact of his intoxication and his emotional state, was that what led to the act, or was it because he was in custody? Why people kill themselves is very difficult to say. To Officer Turner's point of view, he was compliant, he was trite, and he was cooperative. And those are all things that would not lead one to think he's about to kill himself. So the plaintiffs in this case are basically saying that because of the custody, that's what precipitated the act. Is there any evidence from your perspective, your client's perspective, that suggests that that in fact is the case? Or alternatively, that there are other bases that could have led to the suicide having nothing to do with the custody? Well, I don't think that... We have one fact, and that is he wanted to be in custody. He put his hands up. Right. And so I would hardly think that him voluntarily doing that would have increased the likelihood that he wanted to kill himself. I think putting his hands up doesn't necessarily say he wanted to be, it suggests at least that he expected to be. It did take the officer to decide to do it, that's true, but he invited the handcuffing and the officer... Or it was at least showing his compliance. Yes, yes, yes. But there's no indication on our facts that since he was in custody, that that led him to kill himself. But it may be that the deliberate and different standard applies whenever you've taken someone into custody, whether or not the fact of custody increases the risk. It may just be that taking the person into custody puts a responsibility on the custodian. Well, I think as a general matter, if you have somebody in custody, there's a general duty to protect, but as the district court properly phrased it, there's no right to be protected from an unanticipated suicide. You have to frame the right specific to our facts. Yes, but no, we've not argued, though the plaintiff has attributed to us and attributed to the judge, that there's no duty at all to provide some protection. And I might add, Officer Turner was in effect helping protect Dane by putting him in the vehicle, because we had this gathering crowd that some people might have gotten upset about this ten year old girl running down. So again, all of these things that Officer Turner did, I don't think rises to the level of your concluding that your conscience should be shocked by what he did. Thank you. Let's put two minutes on the clock. In 2010, the Ninth Circuit recently held that the failure alone to recognizing suicide potential and preventing suicide was grounds for finding a deliberate indifference. And that was in Kahn versus City of Reno, which I cited page 41 of my brief. I might also add that there was a suicide at the jail in Unalakleet. That's not an unusual thing. So, but this case, the court held that there was a genuine issue of the jury of the question of Reno's failure to train its officers. There was substantial evidence before the court as to the suicide problems in Reno, which isn't a fraction of what it is in Alaska. And this court found that the officers should be trained to recognize potential suicides and to intervene with appropriate training. So I cite that as being a primary case. Just one question. What did Officer Turner observe that you think were signs of suicide or a willingness to commit suicide? The three witnesses at the scene, two eyewitnesses and Freitag, indicated that he had clenched his head and knelt down near the girl and was incoherent, signs of agony, pleading that he's sorry. I didn't mean to do it. I didn't mean to do it. I'm so sorry. I'm sorry. Wrenching with his own conscience and adding to what counsel said. There were threats being hurdled when the little girl's dad and family members arrived. I think I could add to what counsel had to say that there were threats. Yeah, where is he? Who did this type thing? That's true also. So he might have been threatened by the very violent, the potential violence of those gathering, not 50 people, approximately eight. Thank you very much. Okay. Thank you. Thank both sides for your helpful arguments. Johnson versus City of Unacoly now submitted for decision.
judges: Goodwin, Fletcher, Smith